702 A.2d 98 (1997)
In re P.S.
No. 96-208.
Supreme Court of Vermont.
August 8, 1997.
*99 Michael Benvenuto, Vermont Legal Aid, Inc., Waterbury, for appellant P.S.
Jeffrey L. Amestoy, Attorney General, Montpelier, Ira N. Morris and Jessica G. Porter, Assistant Attorneys General, and Marybeth McCaffrey, Special Assistant Attorney General, Waterbury, for appellee Department of Developmental and Mental Health Services.
Before GIBSON, DOOLEY; MORSE and JOHNSON, JJ., and ALLEN, C.J. (Ret.), Specially Assigned.
DOOLEY, Justice.
P.S. appeals the Washington Family Court's decision to revoke her order of nonhospitalization, and enter a new order of hospitalization, based upon findings that she was not complying with the order and was a patient in need of further treatment. The issues raised on appeal are (1) whether the family court's findings are supported by clear and convincing evidence, and (2) whether the applicable statutes, or (3) the Vermont or federal constitution, require a court to find that a patient is dangerous to herself or others at the time of revocation of an order of nonhospitalization. We conclude that the issue regarding the family court's findings is moot; we affirm the trial court's application of the "patient in need of further treatment" standard in determining whether to rehospitalize P.S.
*100 P.S. was formerly a patient at the Vermont State Hospital and is mentally ill. In April 1995, she was released from the hospital on an order of nonhospitalization pursuant to 18 V.S.A. § 7621(c). The order provided for extensive supervision by the community mental health agency in the area in which P.S. went to reside. She was required to take all medicine prescribed by her psychiatrist and to take it in the presence of agency staff if they so required. She was required to comply with her treatment plan and keep all appointments with her case manager. Initially, she was required to live in a facility with twenty-four-hour supervision, but the agency could, and did, allow her to move to her personal condominium on August 15, 1995.
The family court made the following finding about P.S.:
She requires for this illness, both medication and frequent, regular contact with mental health professionals. Her illness has a long history with a well established pattern in which she periodically stops taking her medication, decompensates to a serious degree, such that she requires hospitalization. Her history establishes that in the early stages of decompensation she refuses medication, shows poor judgment, becomes angry and irritable. Her history also shows that she tends to decompensate rapidly, which is characteristic of her particular form of mental illness. She can do so within a period of two to four weeks. Her history also shows that it takes quite a long time for her to respond to the resumption of medication and to get back on track after a period of decompensation.
On August 24, 1995 the Commissioner of Mental Health and Mental Retardation, acting on behalf of the State pursuant to 18 V.S.A. § 7621(d), notified the family court that P.S. was out of compliance with the court's order of nonhospitalization, and requested permission to rehospitalize P.S. due to her noncompliance. At the hearing on the petition, the State produced evidence showing that P.S. had refused to take her medication in front of staff, was unable to keep all her medical appointments, and occasionally missed her day treatment program. The court found that P.S.'s behavior violated the order of nonhospitalization and that
[i]f she were to receive no treatment for her mental illness, at this time she would most certainly decompensate within a matter of days. . . . And within a matter of a few days, she represents a danger to herself in that her judgment and mood are so seriously affected by her mental illness, that she'd be unable to provide for her daily needs.
The court found P.S. to be a patient in need of further treatment and that hospitalization "is adequate and appropriate to her condition." The court revoked the order of nonhospitalization and ordered P.S. to be hospitalized.
P.S. filed a motion to reconsider the court's revocation order, arguing that the court incorrectly revoked her order of nonhospitalization on a finding of future dangerousness, rather than a finding of current dangerousness. On March 28, 1996, the family court issued an opinion, affirming its decision to revoke the order of nonhospitalization and concluding that the appropriate standard for revocation is that of a patient in need of further treatment. P.S. appeals the court's findings and the standard of dangerousness used at the revocation hearing.

I.
We must first determine whether the issues raised by P.S. are moot. The general rule is that a case becomes moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome. In re H.A., 148 Vt. 106, 108, 528 A.2d 756, 757 (1987). The actual controversy must be present at all stages of review, not just when the case was filed. See Doria v. University of Vermont, 156 Vt. 114, 117, 589 A.2d 317, 319 (1991). At the time of argument to this Court, P.S. had been released under a new order of nonhospitalization and was living in the community. Thus, the order she appeals no longer has any effect on her commitment status or residence. As a result, the case is moot unless it fits within an exception to the mootness doctrine.
*101 This Court has recognized two exceptions to the mootness doctrine which might apply to all or part of this case. First, a case is not moot when negative collateral consequences are likely to result from the action being reviewed. See State v. Condrick, 144 Vt. 362, 363, 477 A.2d 632, 633 (1984). In the past, we have applied this exception to commitment cases due to the social stigmatization that remains after being involuntarily committed in a state facility. Id. at 364, 477 A.2d at 633; State v. O'Connell, 136 Vt. 43, 45, 383 A.2d 624, 625 (1978) (negative collateral consequences can apply in mental health commitment cases because "[t]he legal disabilities radiating from the label of mentally incompetent are myriad"). Second, a case is not moot when the underlying situation is capable of repetition, yet evades review. See State v. Tallman, 148 Vt. 465, 469, 537 A.2d 422, 424 (1987). This exception applies only if: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975).
Whether the trial court's findings are supported by clear and convincing evidence does not fall within either of the exceptions to mootness. First, the exception for negative collateral consequences does not apply because P.S. has already been committed a number of times in the past. In addition, the issue on appeal is the location of commitment, not the fact of commitment. We do not believe that any additional collateral consequences hinge on the result of this appeal. Cf. In re C.C., 150 Vt. 112, 113, 549 A.2d 1058, 1059 (1988) (where patient concedes she is mentally ill, adverse collateral consequences from order of involuntary medication are "minimal"; dispute over order is mooted by State's statement that it would no longer enforce order); O'Connell, 136 Vt. at 45, 383 A.2d at 625 (ruling that exception applies must be based on facts of case before court; fact that patient had been hospitalized on one prior occasion "does not necessarily vitiate the collateral consequences of the contested commitment"); In re M.A.C., 134 Vt. 522, 523, 365 A.2d 254, 255 (1976) (on record before court, mental health commitment case was moot). Second, the exception for situations capable of repetition yet evading review does not apply because the court's findings were specific to August 1995; any future revocations of P.S.'s order of nonhospitalization will be based on new fact patterns. See State v. Gundlah, 160 Vt. 193, 196, 624 A.2d 368, 370 (1993) (exception to mootness does not apply because repetition of fact pattern is unlikely).
The standard of dangerousness to be applied at revocation hearings does, however, fall within the exception for situations capable of repetition yet evading review. Given P.S.'s past history, the general circumstances that gave rise to the revocation of P.S.'s nonhospitalization order are likely to occur again. Furthermore, the parties continue to disagree on when the Commissioner may intervene and seek revocation of the nonhospitalization order, and what standard of dangerousness should apply at the revocation hearing. We therefore conclude that the standard of dangerousness to be applied at revocation hearings of nonhospitalization orders is not a moot issue. See Condrick, 144 Vt. at 364, 477 A.2d at 633.

II.
P.S. contends that, under the Vermont mental health statutes, an order of nonhospitalization may not be revoked unless the Commissioner proves that a patient is dangerous to himself or others at the time of the revocation hearing. In the terminology of the mental health statutes, the issue is whether the trial court must find that the patient is a "person in need of treatment" or a "patient in need of further treatment." A "person in need of treatment" is defined as "a person who is suffering from mental illness and, as a result of that mental illness, his capacity to exercise self-control, judgment, or discretion in the conduct of his affairs and social relations is so lessened that he poses a danger of harm to himself or others." 18 V.S.A. § 7101(17) (emphasis added). A "patient in need of further treatment" is defined as "(A) A person in need of *102 treatment, or (B) A patient who is receiving adequate treatment, and who, if such treatment is discontinued, presents a substantial probability that in the near future his condition will deteriorate and he will become a person in need of treatment." 18 V.S.A. § 7101(16) (emphasis added).
To capture the essence of the difference, the parties have often referred to the former standard as one of present dangerousness and the latter standard as one of future dangerousness. P.S. argues that the present dangerousness standard must apply to this revocation proceeding; the Commissioner argues that the future dangerousness standard applies. Although we understand the difference the parties are presenting, we stress that the real difference is in the effect, or anticipated effect, of treatment. All standards attempt to predict future actions based on past conduct and necessarily look to future dangerousness. The "person in need of treatment" standard assumes that there is no ongoing treatment to respond to the person's mental health condition. The "patient in need of further treatment" standard applies to both a person in need of treatment as well as a patient who is already receiving adequate treatment; in the latter case, the statute looks to the effect of discontinuing treatment.
P.S. contends that the plain language of the statute governing nonhospitalization orders mandates the "person in need of treatment" standard. That statute provides:
(d) If at any time during the period of nonhospitalization ordered under subsection (c) of this section, it comes to the attention of the court, either that the person is not complying with the order, or that the alternative treatment has not been adequate to meet the patient's treatment needs, the court may, after proper hearing:
. . . .
(2) Enter a new order directing that the patient be hospitalized for an indeterminate period.
18 V.S.A. § 7621(d). P.S. argues that the term "proper hearing" in § 7621(d) implies a hearing in which the court determines whether the respondent is a "person in need of treatment."
In construing a statute, our objective is to implement the intent of the Legislature. Lemieux v. Tri-State Lotto Comm'n, 164 Vt. 110, 113, 666 A.2d 1170, 1173 (1995). We look to the whole of the statute and every part of it, its subject matter, the effect and consequences, and the reason and spirit of the law. Id. Where a statute is unambiguous, we apply the plain meaning of the words chosen. Id.
We cannot say that the plain language of the statute supports P.S.'s argument. The statutory language does not contain a specific standard of dangerousness, beyond proof that the patient violated the order of nonhospitalization and that hospitalization is appropriate. In addition, the Legislature has clearly demonstrated that it knows how to specify a standard of dangerousness because it has included one in other subsections of the statutory section we are construing. See 18 V.S.A. § 7621(b), (c).
Thus, we must look at the whole of the statutory scheme in order to discern the legislative intent. It is helpful to look first at how the two standards involving dangerousness are used in the rest of the mental health commitment scheme. An application for involuntary commitment must be accompanied by a certificate of a licensed physician, prepared within five days of the filing of the petition, that the proposed patient is a "person in need of treatment," or by a statement that the proposed patient refuses to submit to an examination by a licensed physician. Id. § 7612(e). At the hearing, the State must prove by clear and convincing evidence that the person was a "person in need of treatment" at the time of emergency admission to the hospital or application and that the person is a "patient in need of further treatment" at the time of hearing. Id. §§ 7616(b), 7617(b). If the State meets its burden, the court can order that the patient be hospitalized or "undergo a program of treatment other than hospitalization." Id. § 7617(b). The initial treatment order has a duration of ninety days. Id. §§ 7618(a), 7619. It may be extended thereafter if the court finds that the patient is a "patient in *103 need of further treatment." Id. § 7621(b), (c).
Although the statute requires the State to show a proposed patient is a "person in need of treatment" at the time of application for original commitment, no subsequent decision requires a showing of dangerousness. The statutory structure assumes that treatment will reduce or eliminate the risk of harm from the patient's conduct. See id. § 7617(e). If the treatment is effective, a treated patient will not be dangerous. As a result, subsequent decisions about how and where a patient will receive treatment involve predictions about the effect of discontinuing treatment, rather than dangerousness.
In light of the statutory structure, we cannot hold that the words "proper hearing" in § 7621(d) require the State to prove that the respondent is a "person in need of treatment." The Legislature intended that nonhospitalized patients receive treatment, and that decisions about the place of treatment be based on the predicted effect of that treatment. It would be inconsistent to require a finding that a patient is a "person in need of treatment" to order hospitalization after a period of nonhospitalization, but to allow an order of indefinite hospitalization to be based only on a finding that the patient is "in need of further treatment." Moreover, the effect of P.S.'s construction of the statute is to require the State to meet the requirements of a new commitment after the breach of the terms of a nonhospitalization order. The order would actually be the equivalent of a discharge from commitment with no means of enforcing its terms. We will not construe the statutes in such an irrational fashion. See State v. Quinn, 165 Vt. 136, 140, 675 A.2d 1336, 1338 (1996).
We do not believe that our decision in In re R.A., 146 Vt. 289, 501 A.2d 743 (1985), requires a different result. In R.A., we concluded that the State must provide "adequate and appropriate" treatment both at the original commitment and when it seeks to extend commitment indefinitely. Id. at 290, 501 A.2d at 743. By extension, P.S. argues that the "person in need of treatment" standard applies to both the original commitment and to all later stages in the commitment proceedings, including the decision whether to revoke an order of nonhospitalization. We disagree. In In re R.A., it was entirely consistent with the statutory scheme to hold that the State's obligation to provide adequate and appropriate treatment continued throughout the period of commitment, even though the statutory statement of that standard was contained only in a section governing the original commitment decision. Indeed, it would have been irrational to hold that the State's obligation to provide treatment ended with the commitment of the patient. Here, the use of a legal standard applicable to the original commitment decision in deciding whether to revoke an order of nonhospitalization is inconsistent with the statutory scheme and would produce an irrational result.
We therefore hold that, to the extent that 18 V.S.A. § 7621(d) requires the State to show dangerousness to revoke a nonhospitalization order, it is sufficient that it prove that the patient is a "patient in need of further treatment" as defined in 18 V.S.A. § 7101(16).

III.
Even if not statutorily required, P.S. contends that her nonhospitalization order may not be revoked under the federal and state constitutions unless the State proves that she is a "person in need of treatment." We hold that the federal and state constitutions do not require the State to prove that P.S. is "a person in need of treatment" in order for the court to revoke her order of nonhospitalization, and conclude that the "patient in need of further treatment" standard complies with due process of law.
P.S.'s constitutional arguments rely primarily on the United States Supreme Court decision in O'Connor v. Donaldson, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), and the decision of this Court in G.T. v. Stone, 159 Vt. 607, 622 A.2d 491 (1992). O'Connor holds that a state may not confine mentally ill persons "involuntarily if they are dangerous to no one and can live safely in freedom." 422 U.S. at 575, 95 S.Ct. at 2493. *104 As explained in Addington v. Texas, 441 U.S. 418, 426, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979):
The state has a legitimate interest under its parens patriae powers in providing care to its citizens who are unable because of emotional disorders to care for themselves; the state also has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill. . . . [T]he State has no interest in confining individuals involuntarily if they are not mentally ill or if they do not pose some danger to themselves or others.
These limits apply not only at the time of original commitment but throughout the period of confinement. See O'Connor, 422 U.S. at 575, 95 S.Ct. at 2493-94; Foucha v. Louisiana, 504 U.S. 71, 77, 112 S.Ct. 1780, 1784, 118 L.Ed.2d 437 (1992).
In G.T. v. Stone, 159 Vt. at 611, 622 A.2d at 493, this Court held that a patient committed to the Vermont State Hospital and conditionally discharged "has a liberty status that cannot be terminated without due process of law." The constitutional ruling was necessary because, despite the similarity between the position of a patient under an order of nonhospitalization and a patient who has been conditionally discharged from the hospital, the Legislature had not provided for a prerevocation hearing for a conditionally discharged patient. We held that federal due process requires a hearing prior to recommitment "unless immediate recommitment is required because the person poses an imminent danger of harm to himself or another." Id. at 613, 622 A.2d at 494. We reached the same result under the Vermont Constitution.
P.S. argues that (1) following G.T., she has a due process right to a hearing before her order of nonhospitalization may be revoked, and (2) that O'Connor requires the court to apply a present dangerousness standard at the revocation hearing. Although we agree with the first step of the argument, we do not accept the second step. G.T. is a procedural due process decision that does not address substantive due process standards applicable to commitment or continued confinement of mental patients. To the extent that the decision requires that hearings be based on a "person in need of treatment" standard, it is because the conditional discharge statute contains this standard. As decided above, the statute governing revocation of nonhospitalization orders allows use of a "patient in need of further treatment" standard.
We agree that the State is required to comply with O'Connor at all stages of the commitment process, including the revocation of an order of nonhospitalization.[1] We do not agree that O'Connor prevents use of a "patient in need of further treatment" standard for revocation of an order of nonhospitalization. Although O'Connor, and later decisions that have followed it, have stated the general proposition that mentally ill persons who are not in any sense dangerous to themselves or others may not be involuntarily confined, the Supreme Court has never created a constitutional definition of "dangerous." Indeed, the Court in Addington acknowledged that "the substantive standards for civil commitment may vary from state to state." Addington, 441 U.S. at 431, 99 S.Ct. at 1812. Recently, in Kansas v. Hendricks, ___ U.S. ___, ___, 117 S.Ct. 2072, 2081, 138 L.Ed.2d 501 (1997), the Supreme Court reaffirmed this view, stating that it has "never required State legislatures to adopt any particular nomenclature in drafting civil commitment statutes."[2]
In this context, dangerousness is an "amorphous concept" that is highly dependent on its application. See Note, Involuntary Civil Commitment: The Dangerousness Standard and Its Problems, 63 N.C. L.Rev. *105 241, 246 (1984). Many states have defined the concept with no more certainty and imminence than our "patient in need of further treatment" standard, and these definitions have generally been upheld by state and federal courts. See Hendricks, ___ U.S. at ___, 117 S.Ct. at 2081; Project Release v. Prevost, 722 F.2d 960, 971-74 (2d Cir.1983); In re Pima County Mental Health, 169 Ariz. 141, 817 P.2d 945, 946 (Ct.App.1991); People v. Taylor, 618 P.2d 1127, 1134 (Colo.1980); In re Beverly, 342 So.2d 481, 486 (Fla.1977); In re Albright, 17 Kan.App.2d 135, 836 P.2d 1, 6 (1992); In re LaBelle, 107 Wash.2d 196, 728 P.2d 138, 143-46 (1986).
We signaled in In re L.R., 146 Vt. 17, 20-22, 497 A.2d 753, 755-57 (1985), that we would view the concept of dangerousness flexibly in accordance with the circumstances before us. In that case, we declined to adopt an overt act requirement, finding it was not a prerequisite to compliance with due process. Id. at 21, 497 A.2d at 756. We upheld a determination that a patient was sufficiently dangerous to be a person in need of treatment on findings of decompensation very similar to those present here. Id. at 22, 497 A.2d at 757.
We also emphasize that the State is using a "patient in need of further treatment standard" for a patient it has treated and for whom there is specific evidence of the effect of rejection of medication. Under P.S.'s view of the constitutional requirements, the State has to wait until she actually becomes dangerous to intervene. The result would be a "revolving door" syndrome characterized by recurring commitments, medication, rejection of medication, and crisis intervention. See In re LaBelle, 728 P.2d at 145; P.E. Van Horn, Revocation of Conditional Release in New York State: What Process is Due?, 27 Colum. J.L. & Soc. Probs. 523, 523-24 (1994). We see no constitutional barrier to using a predictive dangerousness standard where the patient is receiving adequate treatment, as the statute requires, and the State has evidence of the result of withdrawal of that treatment.
Finally, we believe that the State must have adequate tools to enforce the conditions of the nonhospitalization order. In some cases, alternatives to rehospitalization may be adequate and should be used. See 18 V.S.A. § 7621(d)(1) (on noncompliance with order, court may "[c]onsider other alternatives, modify its original order and direct the patient to undergo another program of alternative treatment"); In re W.H., 144 Vt. 595, 598, 481 A.2d 22, 25 (1984). We do not believe, however, that due process deprives the State of the remedy of rehospitalization where appropriate and necessary.
P.S. has specified no reason why the result should be different under the Vermont Constitution, and accordingly we have not considered separately claims based on that source.
Affirmed.
NOTES
[1] P.S. confuses the procedural due process holding of G.T. v. Stone with the substantive due process holding of O'Connor. The fact that we held in the former case that the liberty interest of a conditionally discharged patient is sufficient to invoke procedural due process protections is irrelevant to the contours of any dangerousness requirement imposed by substantive due process.
[2] Although Kansas v. Hendricks involves a challenge to the definition of mental abnormality used in the Kansas Sexually Violent Predator Act, its reasoning is equally applicable to the definition of dangerousness. Indeed, the Court characterized the standard of dangerousness in the Kansas Act as one of "future dangerousness." ___ U.S. at ___, 117 S.Ct. at 2080.