2008 VT 89

**In re Petition of VERMONT DEPARTMENT OF PUBLIC SERVICE for an Investigation into the Reliability of the Steam Dryer and Resulting Performance of Vermont Yankee Nuclear Power Corporation Under Uprate Conditions**

[959 A.2d 564]

No. 07-031

¶ 1. July 10, 2008. This appeal arose after the Vermont Public Service Board (PSB) granted appellants, Entergy Nuclear Vermont Yankee, LLC and Entergy Nuclear Operations, Inc. (Entergy), a certificate of public good (CPG), authorizing Entergy to increase the authorized power output of the Vermont Yankee nuclear power plant by 20%. In this proceeding, the PSB ordered Entergy to post financial security of $2.5 million in case the increase in power output caused a steam dryer at the plant to fail. Entergy argues that the PSB did not have the power to issue the order, because the PSB had modified a CPG without the statutory jurisdiction or authority to do so. We conclude that the issue is moot and dismiss the appeal.

¶ 2. On March 15, 2004, Entergy sought modification of its CPG, authorizing a 20% increase in power output, or "uprate," at the Vermont Yankee facility. In the course of the hearings, the Department of Public Service (DPS) expressed concern that the uprate would cause the steam dryer to fail, especially since similar failures had occurred at other similarly-designed nuclear power plants in other locations. Although taking evidence on the issue, the PSB ultimately granted the CPG in March 2006 without attaching any conditions involving the steam dryer. In February, and in part to address its concerns with the steam dryer, DPS en-

tered into a "stand still agreement" with Entergy. Under this agreement, DPS would monitor the power-ascension testing and be granted the power to request further investigation of the steam dryer if necessary. In return, DPS agreed not to litigate its concerns about steam-dryer reliability before the PSB issued the CPG.

¶ 3. The power-ascension testing was successfully completed in May 2006, but the PSB remained concerned that the uprate would pose a significant, if unquantifiable, threat to the reliability of the steam dryer. The PSB expressed doubt about the significance of power-ascension test results in light of the unexpected shutdown of the steam dryer that occurred in the middle of testing, and became convinced that the shutdown was evidence of a condition already affecting the reliability of the steam dryer. Thus, on June 21, 2006, DPS petitioned the PSB for a modification of the original CPG, invoking both the February "stand still agreement" and 30 V.S.A. §§ 209 and 231. Later, in a motion to amend, DPS also invoked § 248 as a basis for jurisdiction.

¶ 4. The PSB issued the order herein appealed on September 18, 2006, finding that it could exercise jurisdiction under 30 V.S.A. § 209(a)(3). After reviewing the substance of the concerns expressed by DPS, the PSB nonetheless found that the power-ascension testing "had been successful and that the tests indicated no problems with the increased steam flow that would likely cause failure of the steam dryer." However, the PSB agreed with DPS that steam-dryer failures at other nuclear facilities suggested that "a common steam dryer design . . . could, at least in part, be a factor in the outages." The PSB acknowledged that it had discounted similar comparisons in the 2004 proceedings, but suggested that the 2006 evidence involved a greater number of plants with similar steam-dryer designs and presented a more compelling case for

a pattern of related failures. The PSB further noted its uncertainty as to whether power-ascension testing was able to detect all the risks represented by the design of the steam dryer or its performance at uprate conditions.

¶ 5. The Board required Entergy to submit a plan for additional ratepayer protections. Entergy submitted, and the PSB approved, a "Ratepayer Protection Plan" that made Entergy responsible for up to $2.5 million of extra utility rates caused by a derate as a result of dryer failure during uprate conditions.[1] The plan would remain in effect from October 2006 until "two months after the first refueling cycle in which no outage or derate occurs." The PSB limited the period of the plan to "allow for an extended period of operation under uprate conditions that will alleviate concerns about steam dryer failure as well as inspection of the steam dryer during the next refueling outage," noting that if there was no problem with the steam dryer "the ratepayer protections will remain in place less than a year." In fact, the steam dryer did not fail. The inspection showed that it was structurally sound, and the ratepayer protections expired in August 2007.

¶ 6. Entergy appealed the PSB order, but counsel for Entergy noted at oral argument that the issues related to the specific order and the circumstances under which it was granted were moot because of the expiration of the plan. Coun-

___

[1] Under the ratepayer protection plan a derate is "the sustained operation of the plant at less than 97% of the uprate operating level for a period of greater than five consecutive days for reasons directly resulting from the extended power uprate's effects on the plant steamdryer." The derate period "starts on the sixth consecutive day and will end when and if the plant comes off-line or restores power above 97% of the uprate operating level."

sel argued, however, that the controversy over whether the Board had jurisdiction to issue such an order survived under an exception to the mootness doctrine.

¶ 7. As we have frequently held, the parties must have a " 'legally cognizable interest in the outcome' of the case throughout the entire proceeding." *In re S.N.*, 2007 VT 47, ¶ 5, 181 Vt. 641, 928 A.2d 510 (mem.). There are, however, exceptions to the mootness doctrine. One is for an issue that is "capable of repetition, yet evades review." *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983). The rule is limited to the "exceptional situation," *id.*, in which "(1) the challenged action is in its duration too short to be fully litigated prior to cessation . . . and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Spencer v. Kemna*, 523 U.S. 1, 17 (1998); *In re PCB File No. 92.27*, 167 Vt. 379, 380-81, 708 A.2d 568, 569-70 (1998); *State v. Tallman*, 148 Vt. 465, 469, 537 A.2d 422, 424 (1987). More importantly, the injury must not be too dependent on the facts of an individual case. *In re P.S.*, 167 Vt. 63, 68, 702 A.2d 98, 101 (1997); *State v. Gundlah*, 160 Vt. 193, 196, 624 A.2d 368, 370 (1993).

¶ 8. Entergy argues that the problem presented in this appeal will always evade review in this manner. Specifically, Entergy notes that it has recently had equipment failures that led to derates under the standard adopted in the ratepayer protection plan. According to Entergy, parties before the PSB have argued that these failures were caused by the uprate and that the PSB should put in place a ratepayer protection plan for these failures. Thus, Entergy argues, the issue of whether the Board has jurisdiction to issue such orders is live.

¶ 9. In making this argument, Entergy has particularly addressed the second prong of the mootness exception. Entergy relies in particular on two decisions of this Court, *In re P.S.*, 167 Vt. at 68, 702 A.2d at

101, and *State v. Schaefer*, 157 Vt. 339, 345, 599 A.2d 337, 341-42 (1991). In the latter, we reviewed the standard under which a district court must consider motions to seal affidavits in support of probable cause and to close hearings on motions to suppress in criminal cases. We agreed that the specific ruling in the case was moot, but held that the challenge to the general standard employed by the court to evaluate such motions fell under the mootness exception. In *P.S.*, a case in which a person subject to an order for nonhospitalization challenged its revocation, we held that the issue of whether the circumstances justified revocation was moot and not within the exception, but the controversy over the applicable general standard for revocation fit within the exception. 167 Vt. at 68, 702 A.2d at 101. We reached the latter conclusion because the person was likely to face revocation again in the future. *Id.*

¶ 10. We cannot conclude that Entergy satisfies the second prong of the mootness exception. As Entergy originally argued on the merits, the Board found that it had the authority to modify its March 2004 order only because of the presence and terms of the stand-still agreement. Irrespective of the Board's statements about the scope of its § 209(a)(3) authority, the Board explicitly stated that the stand-still agreement provided a significant exception to the finality of modification decisions made by the Board pursuant to § 248. We have no reason to believe that a similar stand-still agreement will ever be executed again. Indeed, the agreement involved here came before the CPG was final. The PSB is not seeking such an agreement as to other types of failures, and Entergy has the power to decide whether to sign another such agreement, a power that it is likely to exercise differently now that it knows how the PSB will interpret such an agreement. Thus, unlike in *P.S.* and *Schaefer*, there is no identifiable core legal issue present in this case that is likely to recur. We conclude that the injury complained of by Entergy was specific to the facts of this case and does not qualify under the exception for injuries capable of repetition yet evading review. *Id.*

¶ 11. Were we to conclude otherwise, Entergy would still be unable to meet the first prong of the mootness exception — to show that this issue is capable of repetition, yet evades review. The first prong requires that "the challenged action [be] too short to be fully litigated prior to cessation." *Spencer*, 523 U.S. at 17. In considering this element, we have examined whether, in the future, the complaining party "would not be able to challenge [the action] effectively." *Hunters, Anglers & Trappers Ass'n of Vt. v. Winooski Valley Park Dist.*, 2006 VT 82, ¶ 16, 181 Vt. 12, 913 A.2d 391; *Tallman*, 148 Vt. at 469, 537 A.2d at 424. The ratepayer protection plan was in effect for ten months, enough time for Entergy to appeal if it expedited its production of its brief and the record below and this Court reached the case when it was ready.[2] In any event, the issue would not be moot if the ratepayer protection plan was triggered and if Entergy then had to provide the ratepayer relief. We conclude that Entergy "provides no reason why it would not be able to challenge [the action] effectively." *Hunters, Anglers & Trappers Ass'n*, 2006 VT 82, ¶ 16.

*Appeal dismissed.*

---

[2] Entergy did expedite its production of the brief and printed case so that the case was ready for argument in April of 2007. In the absence of any motion from Entergy, the Court did not hold the argument until November, after the ratepayer protection plan had expired.