2013 VT 18

# Gerald Trudell and Myron Dorfman v. State of Vermont and Deborah Markowitz, Secretary of State

[71 A.3d 1235]

No. 11-311

Present: Reiber, C.J., Skoglund and Burgess, JJ., and Cohen and Eaton, Supr. JJ., Specially Assigned

Opinion Filed March 29, 2013

Motion for Reargument Denied May 3, 2013

*Charles L. Merriman* of *Tarrant, Gillies, Merriman & Richardson,* Montpelier, for Plaintiffs-Appellants.

*William H. Sorrell,* Attorney General, and *Keith Aten* and *Micaela Tucker,* Assistant Attorneys General, Montpelier, for Defendants-Appellees.

¶ 1. **Skoglund, J.** Independent candidate Gerald Trudell and voter Myron Dorfman challenge the constitutionality of Vermont's schedule for filing candidate petitions, alleging that the uniform deadline for all party (major and minor) and independent candidates is discriminatory and impermissibly impinges upon the associational and voting rights of candidates and voters under the First Amendment to the United States Constitution. Because we conclude that the filing deadline is a reasonable, nondiscriminatory regulation, justified by Vermont's regulatory interests, we affirm the decision of the lower court in declaring the deadline constitutional.

¶ 2. In 2009, Congress enacted the Military Overseas Voter Empowerment (MOVE) Act to address reports that U.S. troops stationed overseas had difficulties voting by absentee ballot. See 42 U.S.C. § 1973ff-1(a)(8)(A). The Act imposed fixed deadlines by which states had to prepare their ballots. For general elections, ballots are required to be completed 45 days in advance of the election. *Id.* Vermont previously held primary elections relatively late in the electoral cycle on the second Tuesday in September. To comply with the requirements of the MOVE Act, Vermont enacted Act 73. 2009, No. 73 (Adj. Sess.), § 1. Section 1 of Act 73 moved Vermont's primary election date to the fourth Tuesday in August — theoretically the latest possible date by which the Secretary of State could receive the primary results from the towns, complete

the canvas process, prepare the ballot styles, and receive the general election ballots back from the printers in time to meet the 45-day federal deadline. 17 V.S.A. § 2351 (setting primary date to comply with MOVE Act). Because of the new primary election date, the Legislature moved the deadline for primary registration to mid-June. *Id.* § 2356 ("not later than 5:00 p.m. on the second Thursday after the first Monday in June").

¶ 3. The Legislature enacted an additional change: the Legislature moved the date by which independent candidates were required to file their statements of nomination to run in the general election so as to make that deadline coincide with the deadline by which party candidates were required to file their primary petitions. Compare 2009, No. 73 (Adj. Sess.), § 7 (codified at 17 V.S.A. § 2402(d)), with 17 V.S.A. § 2402(d) (prior to amendment). Independent candidates were previously permitted to file nominating petitions up to three days after the primary election. The Director of Elections testified that a change was required to comply with the MOVE Act but believed that the Thursday before the primary (two working days plus the intervening weekend) would provide adequate time to review the independents' petitions and identify all candidates, including those running on multiple tickets.

¶ 4. Instead of four calendar days before the primary election, the Legislature required independent candidates to register on the same day as primary candidates. That is, independents now have to file their petition for candidacy by the second Thursday after the first Monday in June, advancing the registration date by approximately seventy days. See 17 V.S.A. § 2356.

¶ 5. Plaintiff Gerald Trudell has a longstanding interest in politics and the environment. To bring attention to environmental issues, Trudell first ran for Vermont's seat in the U.S. House of Representatives in 2006, claiming 1000 votes. He ran again in 2008 and acquired 10,000 votes. In 2010, Trudell decided to run again, two days before the newly-implemented June deadline but was unable to collect the requisite signatures for registration. In late August, he filed a petition anyway but was denied a place on the ballot due to his delinquency. He ran instead as a write-in candidate.

¶ 6. Plaintiff Myron Dorfman is a Vermont resident and voter, and occasional supporter of Mr. Trudell. Dorfman voted for Trudell in 2006. Dorfman, like many Vermonters, is more attracted

to individual candidates than to parties, generally. He opposes a June registration deadline for independent candidates because he believes it limits his choice as a voter. For example, he would have voted for Trudell in 2010, but Trudell was not on the ballot because of the advanced deadline. Consequently, both Trudell and Dorfman contend that the new registration date for independent candidates violates their rights, as candidate and voter, under the First and Fourteenth Amendments of the U.S. Constitution and that the trial court erred in finding it constitutional. This contention is unavailing.

■ ¶ 7. It is beyond cavil that the "rights of qualified voters to cast votes effectively and the rights of individuals to associate for political purposes are of the most fundamental significance under our constitutional structure." *Council of Alt. Political Parties v. Hooks*, 179 F.3d 64, 70 (3d Cir. 1999) (quotations omitted); see also *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983). The right to vote in any manner and the right to associate for political purposes, however, is not absolute. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). Article I of the U.S. Constitution provides that states may impose reasonable time, place, and manner restrictions on voting, and thus, courts have recognized that states retain the power to regulate their own elections. See U.S. Const. art. I, § 4, cl. 1; *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973). Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections, and there must be a substantial regulation of elections if they are to be fair and honest. See, e.g., *Storer v. Brown*, 415 U.S. 724, 730 (1974).

■ ■ ¶ 8. The U.S. Supreme Court has set forth the test for determining the constitutionality of ballot access restrictions:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). Accordingly, when a state imposes a severe restriction on access to the ballot, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 289 (1992). And, when a state election law provision imposes "reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434 (quotations omitted).

¶ 9. In *Anderson*, the Court overturned an Ohio statute requiring independent candidates to file petitions, signed by 5000 voters, five months before major parties chose their candidates, and nearly eight months before the general election. 460 U.S. at 783 & n.1. The Court stressed two main points. First, the early filing deadline did not apply equally to all candidates, placing independent candidates at a disadvantage. *Id.* at 790-91. Independent candidates who failed to file by the early registration deadline were precluded from appearing on the ballot while candidates elected through major party nominating conventions, regardless of whether they filed a nominating petition, were guaranteed a place on the ballot. *Id.* Thus, by early spring, minor parties were confined to their candidate selection, "whereas the major parties retained the flexibility to react to changing events by nominating candidates who did not emerge until months later." *Hooks*, 179 F.3d at 72 (citing *Anderson*, 460 U.S. at 790-91 n.11). Additionally, the Court concluded that the new filing deadline impeded the signature-gathering efforts of independents due to the remoteness of the elections; caused foreseeable obstacles in recruiting and retaining volunteers, generating media publicity and campaign contributions, and spurring interest amongst voters; and made other organizing efforts more difficult. See *Anderson*, 460 U.S. at 792.

¶ 10. Second, the Court emphasized that the Ohio statute regulated presidential elections, not state or local elections. *Anderson*, 460 U.S. at 794. It explained that presidential election procedures "implicate a uniquely important national interest" because the President "represent[s] all the voters in the Nation," and "the State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries." *Id.* at 794-95.

¶ 11. After finding that the early filing deadline severely burdened the independents' associational rights, the Court considered the state's asserted interests: voter education, equal treatment, and political stability. *Anderson*, 460 U.S. at 796. The Court iterated that an informed voting pool is an important, legitimate state interest. *Id*. However, because of the advances in technology and the rapid dissemination of information, the Court found that voters could receive sufficient information in less than five months. *Id*. at 797 (finding that details about the election are "instantaneously communicated nationwide" and that it is "somewhat unrealistic" to suggest that more than seven months are needed to inform the electorate about the candidate).[1] The Court also rejected the notion that a uniform deadline provided "equal treatment" because the procedures for getting on the ballot were incongruent as between independents and major party nominees. *Id*. at 799. Finally, the Court decided that the statute was not drawn to promote "political stability" or protect the parties from intra-party feuding. *Id*. at 801-05. Moreover, the Court held that the Ohio restriction was unconstitutional because the state's proffered justifications were not narrowly tailored to advance compelling state interests and were outweighed by the severe burdens imposed on the independent presidential candidates. *Id*. at 806.

¶ 12. While election laws will "invariably impose some burden upon individual voters," not all restrictions are unconstitutional. *Burdick*, 504 U.S. at 433. In determining the nature and magnitude of the burden Vermont's election procedures impose on independent candidates and voters,[2] we must examine the entire ballot access scheme. *Hooks*, 179 F.3d at 67; *Libertarian Party of Wash. v. Munro*, 31 F.3d 759, 761-62 (9th Cir. 1994). "The inquiry is whether the challenged restriction unfairly or unnecessarily burdens the availability of political opportunity." *Anderson*, 460 U.S. at 793 (quotation omitted). Put another way, we must determine whether a reasonably diligent independent candidate

---

[1] We note that *Anderson* was decided thirty years ago and the speed with which information is disseminated today is stunning.

[2] As the United States Supreme Court has recognized, "'the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters.'" *Anderson*, 460 U.S. at 786 (quoting *Bullock v. Carter*, 405 U.S. 134, 143 (1972)).

can gain access to the ballot or if instead he or she will rarely succeed. *Munro*, 31 F.3d at 762. Plaintiffs have the initial burden of showing Vermont's advanced deadline seriously restricts the availability of political opportunity. See *id.* at 762.

¶ 13. Under Vermont law, for a candidate's name to appear on the Vermont ballot, he or she must follow the primary election process or the petition process. The primary election process is only available to candidates representing a "major political party," which is defined as any party garnering at least five percent of the votes cast for that office in the most recent general election. 17 V.S.A. § 2103(23). In fact, the primary election, as explained by the Director of Elections in her testimony, serves only as a nomination process for the major political parties. In 2012, Vermont recognized three major political parties, namely Democrats, Republicans, and Progressives. See T. Hallanbeck, "Vermont's Liberty Union Will Be Back As Major Party," *Burlington Free Press*, Nov. 8, 2012, http://blogs.burlingtonfreepress.com/politics/2012/11/08/vermonts-liberty-union-will-be-back-as-major-party/.

¶ 14. Candidates participating in the primary election process start by filing nominating petitions with the Secretary of State around mid-June pursuant to 17 V.S.A. § 2356. As part of the petition, candidates for state and congressional offices must submit 500 signatures. *Id.* § 2355. County offices and state senate positions require only 100 signatures. *Id.* If the statutory requirements are met, candidates' names appear on the primary election ballot, and if they are successful in winning their party's nomination, their names are listed on the general election ballot.

¶ 15. Candidates not affiliated with one of the major political parties must use the petition process to appear on the ballot. Independent candidates, like the major party candidates, are required to obtain the requisite signatures for the desired office. See *id.* § 2401. Prior to the statutory change, independent candidates were required to file their petition three days after the primary election. Now, independents, along with all major party candidates, must submit their petition and nomination statement by mid-June. See *id.* § 2356; see also *id.* § 2402(d) (providing requisites of nomination statement). Nevertheless, if a candidate is unable to get on the ballot, there is always an opportunity for Vermont voters to write in their candidate of choice. See *id.* § 2472(c).

¶ 16. That said, Vermonters have a particular affinity for independent candidates. Vermont's attachment to unorthodox voting goes back to 1990 when the state elected the first independent congressman in forty years, Bernie Sanders. Mr. Sanders went on to be elected to the U.S. Senate and was reelected to his Senate seat again this year. See L. Eaves, "This Year, Record Numbers of Independents Elected," *IVN*, Nov. 22, 2012, http://ivn.us/2012/11/22/this-year-record-numbers-of-independents-elected/. Though Mr. Sanders is by far one of the most visible independent candidates of Vermont, he is hardly alone. In fact, in 2012, there were a total of forty-six independent candidates on the ballot in Vermont, with representatives from Liberty Union, United States Marijuana, VoteKISS, Republican, Peace and Prosperity, Working Families, and Democrat parties. See Vermont Secretary of State, Official Vermont General Election Ballot, available at http://vermont-elections.org/elections1/2012ElectionResults2012%20Sample%20Ballot.pdf.

¶ 17. Plaintiffs allege that a uniform filing deadline makes all members of our society "bend their First Amendment, constitutional rights of association to a time table created for the benefit of two associational groups," by which we assume they mean the two major national political parties. Yet, they fail to succinctly specify how the advanced deadline imposes a burden on candidates or voters. Plaintiffs do not complain of issues recruiting volunteers to help acquire the requisite 500 signatures. See, e.g., *Anderson*, 460 U.S. at 792. There is no filing fee that requires candidates to solicit campaign contributions. Further, there is no indication that the advanced deadline creates a barrier in procuring media attention. See, e.g., *id.* In fact, the superior court found that:

    [T]he general public pays limited attention to the primary races and virtually none to the independent candidates during the summer months. The primaries see low voter turnout in most years. Independent candidates obviously do not appear on primary ballots (unless they have registered as independents and primary candidates) and are rarely included in debates and candidate forums until after the primaries. An independent candidate lucky or skilled enough to attract some media attention could get a small bump from an early registration and an-

nouncement. Most languish unnoticed until the general election season is underway.

¶ 18. While we agree that a June deadline requires a bit more foresight and advance planning from the independent candidates and can thwart candidates who decide to run in response to events arising after June and while we agree that Vermonters have a strong interest in maintaining a solid independent candidate base, nonetheless, as the Supreme Court has recognized, "some cut off period is necessary." See *Hooks*, 179 F.3d at 74 (quotation omitted). And there is no indication from the record that the cutoff here is unreasonable or unfairly deters independent candidates. In fact, the record suggests the opposite — demonstrating the most dramatic increase in registered independent candidates in previous years, with a total of forty-six registered independent candidates — ready and able to meet the statutory requirements. As the court noted, Vermont fosters "an atmosphere in which independent candidates flourish." In addition, there is no evidence that major party candidates are advantaged by the system.

■ ¶ 19. As such, we conclude that the Vermont filing deadline applies equally to all candidates and does not place independents at a particular disadvantage for accessing the ballot. Rather, the registration deadline is a reasonable, nondiscriminatory regulation that imposes at most a minor burden on plaintiffs' rights.

■ ¶ 20. Even a minor burden requires an evaluation of the State's proffered justifications for the advanced deadline. The State contends that its interests in advancing the deadline for independent candidates are to: 1) comply with federal election law; 2) enable the Secretary of State's Office to physically complete and send ballots within the forty-five-day deadline; 3) promote voter education and transparency; and 4) deter "sore loser candidates." "Because the burden is not severe, the State need not proffer a narrowly tailored regulation that advances a compelling state interest. Instead, important regulatory interests provide a sufficient justification." *Hooks*, 179 F.3d at 78.

¶ 21. The State need not provide empirical evidence justifying its interest; however, the State cannot rely on hollow or contrived arguments as justifications. See, e.g., *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 110 (2d Cir. 2008) (holding that, while there are many plausible reasons a state may not provide absentee

ballots, New York's "contrived argument that tabulating absentee ballots could cause a delay in finalizing" ballots was not sufficient justification to outweigh minor burden imposed by regulation). Nevertheless, not all courts require a rigorous showing of legitimacy by the state and accept conceivable notions of interest. In fact, some courts have raised state interests sua sponte. For example, the Third Circuit found a New Jersey statute, which advanced the filing date for independent candidates to be fifty-four days before the primary election (amended to the day of the primary), to be fair and not discriminatory, merely creating a mild burden for candidates and voters, alike. *Hooks*, 179 F.3d 64. The court concluded sua sponte that New Jersey had a strong interest in treating all candidates equally by requiring them to all file on the same day; that New Jersey's deadline is designed to allow primary voters to identify and evaluate all candidates in advance of casting their votes at the primary or to at least have some knowledge of the political terrain; and that New Jersey has a legitimate interest in limiting frivolous candidacies and maintaining a stable and efficient election process, i.e., preventing "sore loser" candidacies.[3] *Id.* at 78-80. Moreover, there is no bright-line rule in assessing the state's interests; courts must take a hard look at the benefits of the regulation to see if they justify the burdens imposed on voters' and candidates' rights.

¶ 22. We agree that the State has a legitimate interest in complying with the federal MOVE Act. However, the MOVE Act merely requires general election ballots to be complete forty-five days in advance of the election. The Act does not expressly require any change in the filing deadline for independent parties. While it is of great import for the State to ensure that the Secretary of State's Office is able to physically complete and send ballots within the forty-five-day federal deadline, the Director of Elections testified that her office could sufficiently meet the federal mandate if independent candidates filed their petitions four days before the primary elections. In other words, the Secretary of State's Office could process independent candidates' petitions if

---

[3] A "sore loser" candidacy is one in which an individual loses in a party primary and then seeks to run in the same election as an independent or minor party candidate. While the New Jersey statute in *Hooks* was not designed to prevent sore losers and therefore was not narrowly tailored to effectuate a compelling state interest, the *Hooks* court found that New Jersey's interest in preventing "sore losers" rises to the level of a legitimate, important state interest. 179 F.3d at 80.

filed during the first week of August. As such, the Director's testimony directly refutes the State's contention that the uniform filing deadline is necessary to comply with the MOVE Act.

¶ 23. The State next suggests the new registration deadline will promote voter education and transparency "because voters learn the entire field of candidates before they have to make a decision about voting in the primary." There is no debate that voter education is an important state interest. See *Storer*, 415 U.S. at 735; *Anderson*, 460 U.S. at 796. In the abstract, the earlier one knows the political terrain, the earlier a voter can evaluate the candidates. But the State fails to tie that truism to a requirement that independent candidates register at the same time as major party candidates.

■ ¶ 24. The State finally asserts that requiring independents to file their petition on the same day as major party candidates prevents sore-loser candidates. As noted above, a "sore-loser" candidate is one who loses in a major-party primary election and then seeks to run in the same election as an independent or minor party candidate. Other courts have held that various state interests are furthered by sore-loser statutes. In *Storer*, 415 U.S. at 735, the Supreme Court addressed a California sore-loser provision, and emphasized the importance of sore-loser statutes in discouraging intra-party feuding and in reserving "major struggles" for general election ballots. See also *Backus v. Spears*, 677 F.2d 397, 399-400 (4th Cir. 1982). In *Clingman v. Beaver*, 544 U.S. 581, 596 (2005), the Court later explained that "sore-loser statutes prevent a candidate who has lost a party primary or nomination from effecting a 'splinter' of a major political party, by joining a minor party while retaining the support of the major party's voters, thereby undermining the major party in the general election." *S.C. Green Party v. S.C. State Election Comm'n*, 612 F.3d 752, 756 (4th Cir. 2010).

¶ 25. Vermont does not have a sore-loser statute. The State claims to have a legitimate interest in creating a system that precludes so-called sore losers and prevents intra-party feuding. Two of the legislators testifying at trial thought it "unfair" to give such candidates "two bites at the apple." Since 1974, sore-loser candidates have affected almost one out of every five state-wide election. However, while the new registration deadline will generally deter the sore-losers, party candidates are still permitted to

register simultaneously for primaries as well as independents. Nonetheless, these individuals registered as both party and independent will be known in advance, and there will no longer be any surprise when the candidate who describes himself or herself as a major party candidate runs as an independent after losing the primary. Based on the supporting case law, the State-claimed desire to prevent sore-loser candidacy finds support.

¶ 26. In sum, the early registration is reasonable, nondiscriminatory, and places a de minimis burden on voters and independent candidates, such that we find that the State's interests, though attenuated, are legitimate and sufficiently justify any mild burden imposed.

¶ 27. In addition to challenging the constitutionality of the statute, plaintiffs also contend that the trial court erred in relying on legislators' testimony regarding the purpose for the change in deadline. Courts generally give little weight to an individual legislator's interpretation of the law once enacted because it cannot reflect the thought processes of the entire Legislature. See *Barber v. Thomas*, 560 U.S. 474, 486, 130 S. Ct. 2499, 2507 (2010). Here, three legislators testified as to their understanding of the purpose behind the new registration deadline. As noted above, two Senators testified that they did not like sore-loser candidates being allowed to run. A former Representative testified that she thought the law would provide greater transparency. Over objection, the court permitted the testimony to provide a "historical" or "factual" basis for the hearings due to the State's inability to procure transcripts from the legislative hearings themselves. Plaintiffs allege that the court improperly derived the legislative intent of the statute from the three legislators' testimony and concluded that the supposed justification, as announced· by the legislators, satisfied the State's burden for its imposition on voters' rights.

¶ 28. Erroneous admission of evidence is harmless, unless a party's substantial right is affected. See V.R.C.P. 61. The burden rests with the plaintiff to show that the error resulted in prejudice. See *In re B.S.*, 163 Vt. 445, 454, 659 A.2d 1137, 1143 (1995).

¶ 29. It does not appear that the court gave considerable, if any, weight to these particular testimonies, merely noting the legislators' opinions in its decision. In fact, it noted that "[t]his

court does not decide whether a deadline which reduces the 'sore loser' phenomenon is a good or a bad idea." It simply held that "[t]he decision to make it more difficult for primary candidates to run after losing is a legitimate policy choice which the Vermont legislature voted into law." Plaintiffs fail to address how they were prejudiced by such testimony, and we fail to find any. Therefore, even if the evidence were improperly admitted as historical evidence, the error, if any, was harmless.

¶ 30. Finally, plaintiffs assert that the alteration in deadlines for independent candidates violates their rights under Articles 7 and 8 of the Vermont Constitution. As this Court has previously held, a party's failure to present any substantive analysis or argument on state constitutional issues constitutes inadequate briefing, which we decline to address. *State v. Jewett*, 146 Vt. 221, 221, 500 A.2d 233, 234 (1985).

¶ 31. Article 7 of the Vermont Constitution, or the Common Benefits Clause, is Vermont's corollary to the Equal Protection Clause of the United States Constitution. Article 7 has been perceived as a more liberal analogue to the Fourteenth Amendment. Plaintiffs, without more, cite the *Baker* decision to assert that the registration deadline is unconstitutional under Vermont law. See *Baker v. State*, 170 Vt. 194, 744 A.2d 864 (1999). Because plaintiffs fail to present any substantive analysis or articulation as to why Article 7 should accord a different read on the constitutionality of the statute, we decline to address the claim.

¶ 32. With respect to Article 8, or the right-to-run provision, plaintiffs contend that because there is no constitutional corollary, the protections afforded by the Vermont Constitution are patently distinguishable from the U.S. Constitution and require no explanation. While plaintiffs correctly highlight that there is no federal counterpart to the right-to-run provision, such a void does not dispense with plaintiffs' requirement to present their argument to this Court nor does it provide plaintiffs with a get-out-of-briefing-free card. In fact, the opposite would be true. Without demarcating how the statute at issue is repugnant to the spirit and law of the Vermont Constitution, plaintiffs fail to adequately brief their claim.

*Affirmed.*

¶ 33. **Reiber, C.J.,** concurring. I acknowledge that the permissive federal constitutional standard applied to nondiscriminatory ballot-access regulations compels the outcome we have reached in this case. I write, however, to emphasize the common-sense observation that the advanced deadline for independent-candidate registration serves mainly to deprive Vermonters of potential choices at the ballot box. It goes almost without saying that a lot can change in the months and weeks leading up to an election. An early deadline will prevent or discourage from running otherwise qualified contenders whose candidacy arises in direct response to those changing circumstances, limiting the range of options available to Vermont citizens. That the earlier deadline accomplishes this reduction in choice with a nearly imperceptible benefit is added cause for concern.

¶ 34. I note also that I share my colleagues' dismay at plaintiffs' failure to adequately brief their claims under the Vermont Constitution. It is rapidly approaching three decades since we first clearly called the bar's attention to the importance of our state charter as an independent and unique source of individual and collective rights. See *State v. Jewett*, 146 Vt. 221, 223, 500 A.2d 233, 235 (1985). Plaintiffs might well have found a standard in the Vermont Constitution requiring more demanding scrutiny of election regulations.

¶ 35. I am authorized to state that Judge Cohen joins this concurrence.