2015 VT 55


 

 


 






In
re T.S.S. (2014-206)

 

2015
VT 55

 

[Filed
10-Apr-2015]

 

NOTICE: 
This opinion is
subject to motions for reargument under V.R.A.P. 40 as well as formal
revision
before publication in the Vermont Reports.  Readers are
requested to
notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us
or by
mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont
05609-0801, of any errors in order that corrections may be made before
this
opinion goes to press.

 

 



 

 

 
 2015 VT 55

 

 

 


 



 

 

 
 No. 2014-206

 

 

 


 



 

 

 
 In
re T.S.S.

 

 
 Supreme Court

 

 

 

 
  

 

 
  

 

 

 

 
  

 

 
 On Appeal from

 

 

 

 
  

 

 
 Superior Court, Rutland Unit,

 

 

 

 
  

 

 
 Family
Division

 

 

 

 
  

 

 
  

 

 

 

 
  

 

 
 March
Term, 2015

 

 

 

 
  

 

 
  

 

 

 

 
  

 

 
  

 

 

 

 
 Cortland Corsones, J.

 

 

 

 
  

 

 

 


 

William H. Sorrell, Attorney General,
and Philip Back,
Assistant Attorney General, Montpelier,



  for Petitioner-Appellee.


John J. McCullough III, Vermont Legal Aid, Inc., Montpelier,
for Respondent-Appellant.
 

 

PRESENT:    Reiber,
C.J., Dooley, Skoglund,
Robinson and Eaton, JJ.

 

 

¶
1.            
ROBINSON, J.  
Respondent T.S.S. appeals from a
decision of the Superior Court, Family Division, granting the
commissioner of
the Department of Mental Health’s application for a continued
order of
non-hospitalization (ONH) compelling T.S.S. to continue undergoing
mental-health treatment.  T.S.S. argues that the superior
court erred in
interpreting 18 V.S.A. § 7101(16) and applying it to
the evidence. 
We agree and vacate the ONH.

¶
2.            
The following facts, taken in the light most favorable to
the State as
the prevailing party, are drawn from the superior court’s
findings and the
evidence presented at the April 2014 hearing on the
commissioner’s petition for
continued treatment.  T.S.S. is a thirty-four-year-old man who
lives in
Rutland.  Since 2000, he has received treatment at Rutland
Mental Health
Services (RMHS).  The commissioner presented two witnesses at
the hearing:
Caitlyn Frazier of the Vermont Department of Mental Health, and Evelyn
Susan Gerretson,
M.D., a psychiatrist and medical director at RMHS.  Ms.
Frazier is
T.S.S.’s case manager, and since 2011 has met with him about
every other
week.  Dr. Gerretson has known T.S.S. for more than a decade
and has been
his treating psychiatrist since around 2006.  She sees T.S.S.
about once a
month.

¶
3.            
Dr. Gerretson testified that T.S.S. suffers from paranoid
schizophrenia,
a thought disorder characterized by hallucinations, delusions, and
deterioration in functioning.  When his condition is left
untreated,
T.S.S. experiences these symptoms.  Dr. Gerretson testified
that T.S.S.
“has demonstrated a clear pattern that for a short period of
time, despite
denying that he has a mental illness, he, on orders of
non-hospitalization,
will take medications and improve significantly.  But when he
is off the
order of non-hospitalization, he quickly goes off medications and
deteriorates.”  T.S.S. is being appropriately
treated under his current
regimen.  He has taken various antipsychotic drugs, initially
orally and
now by injection.  The medication makes T.S.S. less irritable
and more
organized, although Dr. Gerretson testified to some concerns about his
judgment.

¶
4.            
Dr. Gerretson testified that if T.S.S. ended his course of
treatment,
his prognosis would be “poor”; it would be
“very probable that he would revert
back to the prior condition of being disorganized, paranoid, and very
labial,
and revert to past behavior”; and his mental condition would
deteriorate within
a year.  Dr. Gerretson did not testify about whether or when
T.S.S’s
condition would deteriorate to a point where he would become a person
in need
of treatment—that is, a person whose “capacity to
exercise self-control,
judgment, or discretion in the conduct of his or her affairs and social
relations is so lessened that he or she poses a danger of harm to
himself, to
herself, or to others.”  18 V.S.A.
§ 7101(17).  Dr. Gerretson
testified: “I cannot predict the timing because there was a
four-year
. . . [or] three-year period that he was off
orders.”

¶
5.            
Over the fifteen-year history testified to at the hearing,
there was no
evidence that T.S.S. exhibited assaultive behavior or posed a danger to
others.  There was evidence, however, that at times T.S.S.
posed a danger
to himself.  In 1999, T.S.S.’s symptoms first
appeared; he became “very
paranoid, sometimes agitated, breaking glass” and at one
point harmed himself
while suffering a delusion that there was a transmitter in his arm.
 T.S.S. was treated at Vermont State Hospital and was released
on an ONH
in 2000.  In 2002, the commissioner filed an application for
continued
treatment, which the superior court denied in August of that
year.  After
being released from the ONH, T.S.S.—whom Dr. Gerretson
described as a “talented
musician”—traveled to California and worked as a
drummer in a band. 
T.S.S. later returned to his parents’ home in Vermont.

¶
6.            
After returning to Vermont, T.S.S. suffered various
delusions, including
that his father was the head of a large drug cartel and exerted control
over
the government and that his food was poisoned.  He held
conversations with
a picture of his deceased grandfather whom he claimed was
“the ruler of the
world,” suffered from fits of rage, and appeared emaciated.
 T.S.S.’s
parents filed for an emergency evaluation, see 18 V.S.A.
§ 7504, and
T.S.S. was hospitalized at Rutland Regional Medical Center. 
In November
2003, T.S.S. was released from the hospital on a stipulated
ONH.  It was
around this time that T.S.S. first met Dr. Gerretson.  In
September 2004,
the superior court granted the commissioner’s application for
continued
treatment.

¶
7.            
Evidence of T.S.S.’s condition over the
eight-year period from 2004 to
2012 is sparse.  In 2008, RMHS decided not to seek renewal of
the
ONH.  From late 2008 until 2012, T.S.S. was not under any
compulsory
treatment, and was not receiving any services.  The record
does not
indicate why RMHS did not seek renewal of the ONH; nor does it address
T.S.S.’s
condition in 2008 or over the next four years.  In August
2011, T.S.S. was
charged with unlawful mischief greater than $250, a
misdemeanor.  13
V.S.A. § 3701(b).  At the hearing, Dr.
Gerretson testified that she
had only “limited information” on the circumstances
surrounding the charge.[1] 
Following an outpatient evaluation
and competency hearing, the court found on March 2012 that T.S.S. was
not
competent to stand trial.  In August 2012, T.S.S. and the
State stipulated
to the issuance of an ONH in return for dismissal of the charge.

¶
8.            
In June 2013, the commissioner filed an application for
continued
treatment.  T.S.S. did not contest the application and
stipulated to entry
of the order.  Ms. Frazier testified that at some point staff
saw T.S.S.
in distress, “yelling and kind of gesticulating” in
the parking lot before
entering the RMHS office, but that these behaviors diminished after
adopting a
new medication in September 2013.  In February 2014, the
commissioner
filed an application for continued treatment for an additional
year. 
T.S.S. opposed that application, leading to this appeal.

¶
9.            
Evidence concerning T.S.S.’s current (rather
than past) mental state and
conduct was limited.[2] 
In 2014, at the time the hearing took place, there was no evidence that
T.S.S.
had any food-related issues, and Dr. Gerretson testified that he did
not appear
emaciated.  Both witnesses testified that T.S.S.
“does not appreciate
being on orders,” and that “[h]e does not believe
that he has a mental illness
and that he needs treatment.”  T.S.S. also dislikes
the side effects of
some of his medications.  Ms. Frazier testified that
T.S.S.’s hopes to
visit France once his ONH lapses do not seem realistic given his
limited
resources.  Dr. Gerretson also testified that she and her
staff saw T.S.S.
bicycling in the middle of the street, although not during high-traffic
periods.

¶
10.        
On
May 27, 2014, the superior court granted the commissioner’s
application. 
The court concluded:

[I]t
is clear to the court that if [T.S.S.’s] current treatment is
terminated, eventually,
[he] will become a person in need of treatment.  This has been
his pattern
over the last ~15 years.  There is a substantial
probability that
this will happen.  It is unknown when it will
happen.  According to
Dr. Gerretson, whom the court finds credible, [T.S.S.’s]
condition will decline
in 6 months to 1 year.  It is unknown when it will deteriorate
to the
point wherein [T.S.S.] will be “a person in need of
treatment.”  It is the
nature of his particular mental illness that such predictions are very
difficult.  However, he will reach that point.

 

. . . .

 

 
. . . The court concurs with the State’s
parsing of the phrase in 18
V.S.A. § 7101(16) “that in the near future
his or her condition will
deteriorate and he or she will become a person in need of
treatment.”
. . . [T]he phrase “near future”
references when the condition will
deteriorate and not necessarily when the patient will become a person
in need
of treatment.  The intent of the phraseology is met if
[T.S.S.’s]
condition will deteriorate in the near future and this will inexorably
result
in him becoming a “person in need of
treatment.”  It is not necessary that
the State prove that [T.S.S.] will become a “person in need
of treatment” in
the near future as long as his condition will deteriorate in the near
future
and this will inevitably lead to him becoming a “person in
need of treatment.”

 

T.S.S.
appealed.

 

¶
11.        
On appeal,
T.S.S. makes two arguments.  First, T.S.S. argues that the
superior court
erred in construing 18 V.S.A. § 7101(16) to provide
that a person is “a
patient in need of further treatment” if his or her condition
would likely
deteriorate in the near future if treatment were discontinued, without
regard
to whether it would deteriorate to the point where the patient poses a
danger
to himself, herself, or others within the near future. 
Second, T.S.S.
argues that the superior court’s determination is unsupported
by the evidence.

I.  Interpretation
of 18 V.S.A. § 7101(16)

 

¶
12.        
We
first address T.S.S.’s statutory argument. 
“No person may be made subject
to involuntary treatment unless he or she is found to be a person in
need of
treatment or a patient in need of further treatment.”
 18 V.S.A. § 7611.
 In proceedings for involuntary treatment on either basis, the
state has
“the burden of proving its case by clear and convincing
evidence.”  Id.
§§ 7616(b), 7621(a).  If the
superior court finds that the proposed
patient was a person in need of treatment at the time the application
of
treatment was made by the commissioner and was a patient in need of
further
treatment at the time of the hearing, the court may order the person to
undergo
appropriate inpatient or outpatient treatment for a specified time
period.  Id.
§ 7617(b).  “If, prior to the
expiration of
[such an order], the commissioner believes that . . .
the patient
continues to require treatment, the commissioner shall apply to the
court for a
determination that the patient is a patient in need of further
treatment and
for an order of continued treatment,” stating the basis for
the determination
that the patient is in need of further treatment.  Id.
§ 7620(a), (b).  A hearing on the
application for continuing
treatment is held in accordance with the same procedures used for an
application for compulsory treatment in the first instance.  Id.
§ 7621(a).  “If the court finds
that the patient is a patient in need
of further treatment but does not require hospitalization, it shall
order
nonhospitalization for up to one year.”  Id.
§ 7621(c).

¶
13.        
A
“patient in need of further treatment”  is
defined as:

 
(A) A person in need of treatment; or 

 

  (B)
A patient who is receiving adequate treatment, and who, if such
treatment is
discontinued, presents a substantial probability that in the near
future his or
her condition will deteriorate and he or she will become a person in
need of
treatment.

 

Id.
§ 7101(16).  In turn, a “person in
need of treatment” is defined in
relevant part as

a
person who has a
mental illness and, as a result of that mental illness, his or her
capacity to
exercise self-control, judgment, or discretion in the conduct of his or
her
affairs and social relations is so lessened that he or she poses a
danger of
harm to himself, to herself, or to others[.] . . . A
danger of harm to himself or herself may be shown by establishing that:

 

 
(i) he or she has threatened or attempted suicide or serious bodily
harm; or 

 

 
(ii) he or
she has behaved in such a manner as to indicate that he or she is
unable,
without supervision and the assistance of others, to satisfy his or her
need
for nourishment, personal or medical care, shelter, or self-protection
and
safety, so that it is probable that death, substantial physical bodily
injury,
serious mental deterioration, or serious physical debilitation or
disease will
ensue unless adequate treatment is afforded. 

 

Id.
§ 7101(17)(B).

¶
14.        
T.S.S.
argues that the superior court erred in concluding that the
“in the near
future” requirement in 18 V.S.A. § 7101(16)
only applies to the deterioration
in condition, and not also to actually “becom[ing]
a person in need of
treatment.”  The superior court concluded that a
substantial probability
that a person would become a person in need of treatment at
any time in the
future would be sufficient to meet the requirements of the
“will become a
person in need of treatment” language of
§ 7101(16), even if that point
would only come years later.  T.S.S., by contrast, argues that
§ 7101(16) is properly read to require that both the
anticipated
deterioration in a patient’s condition and the becoming of a
person in need of
treatment are substantially likely to occur “in the near
future.”

¶
15.        
The
meaning of § 7101(16) is an issue of statutory
interpretation, which we
consider de novo.  In re M.B., 2004 VT 58,
¶ 6, 177 Vt. 481,
857 A.2d 772 (mem.).  “In
construing a statute,
our principal goal is to effectuate the intent of the
Legislature.”  State
v. LeBlanc, 171 Vt. 88, 91, 759 A.2d 991, 993 (2000)
(quotation omitted).
 In doing so, our starting point is the text of the statute,
because “we
presume that all language in a statute was drafted advisedly, and that
the
plain ordinary meaning of the language used was
intended.”  Id.
(quotation omitted).  In construing statutes, we also
“consider the
purpose of the statute and look to the broad subject matter of the law,
its
effects and consequences, and the reason and spirit of the
law.”  Merkel
v. Nationwide Ins. Co., 166 Vt. 311, 314, 693 A.2d 706,
707-08 (1997)
(quotation omitted).

¶
16.        
Construing
the plain language of § 7101(16) as well as its
purpose and effect, we
hold that the phrase “a substantial probability that in the
near future his or
her condition will deteriorate and he or she will become a person in
need of
treatment” means that the State must show, by clear and
convincing evidence,
that if treatment is discontinued, there is a substantial probability
that in
the near future the person’s condition will deteriorate and
in the near
future the person will become a person in need of treatment.

¶
17.        
Several
factors influence our conclusion.  First, the
statute’s “use of the word
‘and’ indicates an intent for the phrases to be
conjuctive; therefore it is
necessary to comply with both requirements to meet the
definition.”  In
re Request for Jurisdictional Opinion (F-35A Case),
2015 VT 41,
¶ 15, ___ Vt. ___, ___ A.3d ___.  The
construction urged by the State
would essentially read out of the statute the language relating to
“becom[ing]
a person in need of treatment” in “the near
future.”  See Payea v.
Howard Bank, 164 Vt. 106, 107, 663 A.2d 937, 938 (1995)
(“We will not
construe a statute in a way that renders a significant part of it pure
surplusage.” (quotation omitted)).

¶ 18.        
Second, the statute’s purpose is
not to prevent individuals from
mental deterioration in the near future.  Rather, it is to
prevent persons
from “pos[ing] a danger of harm to [themselves] or to
others.”  18 V.S.A.
§ 7101(17).  It goes without saying that all
persons—those receiving
adequate treatment, those in need of treatment, and those with no
illness
requiring treatment—suffer occasional
“deterioration” in mental
condition.  Such deterioration may be a precursor to becoming
a person in
need of treatment, but it might also be a normal reaction to life
events, or a
temporary setback in the course of an ongoing illness.  The
Legislature’s
inclusion of the requirement that the person, if left untreated, would
become a
person in need of treatment in the near future reflects an intent to
prevent
persons from posing a danger of physical harm to themselves or to
others. 
Put simply, the legislative scheme evinces a concern not with
deterioration in
itself, but with the consequences of the deterioration—the
patient’s becoming a
person in need of treatment.  The statutory scheme does not
authorize
involuntary treatment of a person in need of treatment in the first
instance
based on a finding that he or she may at some point in the future
become a
danger to himself, herself, or others.  Given this, it would
be odd to
allow continued involuntary treatment of an
individual based solely on a
finding that he or she was likely to pose a danger in the distant
future.
 See Heffernan v. Harbeson, 2004 VT 98,
¶ 7, 177 Vt. 239, 861
A.2d 1149 (noting that in
resolving any “doubt or
ambiguity” in statute, “we discern legislative
intent by considering the statute as a whole, reading integral parts of the
statutory scheme together”).

¶
19.        
Third, our review
of the legislative history underlying this
statute reinforces this understanding.  See Perry v.
Med. Practice Bd.,
169 Vt. 399, 406, 737 A.2d 900, 905 (1999) (noting that
“legislative history
and circumstances surrounding [a statute’s] enactment, and
the legislative
policy it was designed to implement,” may be helpful in
discerning legislative
intent).  The Legislature established Vermont’s
modern statutory scheme
governing compulsory mental-health treatment in 1978.  1977,
No. 252 (Adj.
Sess.).  The definitions of “person in
need of further treatment”
and “person in need of treatment” remain in effect
today, and have never been
substantively amended.  18 V.S.A.
§ 7101(16), (17).[3]

¶ 20.        
The Senate Health and Welfare Committee heard
testimony from two
witnesses during its hearings on this bill on March 8 and 30, 1977.[4] 
We
recognize the perils of discerning legislative intent on the basis of
statements
of individual witnesses in committee hearings, but in this case we
conclude
that the key witnesses’ statements are instructive. 
The only two
witnesses who testified before the Senate committee expressed a common
understanding, even though they represented different
stakeholders—the
Department of Mental Health and Vermont Legal Aid—with
disparate
perspectives.  See In re Hinsdale Farm,
2004 VT 72,
¶ 17, 177 Vt. 115, 858 A.2d 249 (“While we
have stated that testimony and
statements of legislative witnesses and individual legislators can be
‘inconclusive at best,’ we cite the committee testimony
and legislators’ discussions here because they convincingly
illustrate
. . . the Legislature[’s]
intent.” (quoting Vt. Dev. Credit Corp.
v. Kitchel, 149 Vt. 421, 428, 544 A.2d 1165, 1169 (1988)).

¶
21.        
During
both committee hearings, testimony was given by Peter Bluhm, an
assistant
attorney general assigned to the Department of Mental Health who was
closely
involved in drafting the legislation.  Mr. Bluhm stated that
the
legislation was the result of collaboration between “a broad
cross-section” of
interested parties—including mental-health agencies, legal
aid organizations,
and citizens’ groups—who had formulated a
compromise bill over two years. 
Mar. 8 Hr’g Tr. at
5.  He
explained that the legislation was to be a replacement for
the then-existing legislative scheme, which had “some
constitutional
infirmities.”  Id. at 7; see
also Mar. 30 Hr’g Tr. at 54 (statement
of Mr. Bluhm that
bill is intended to make standards
“more constitutionally acceptable”).  He
explained, for example,
that the then-existing law
“allows for commitments of
people who are mentally ill and lacking in insight, concerning their
need for
treatment,” which Mr. Bluhm noted “has been
held by a couple of courts to be unconstitutional.” 
Mar. 8 Hr’g Tr. at
9.  The enactment of S. 103 was designed to rectify these
infirmities and
avoid the “disaster . . . [of] having major
parts of our
mental-health law declared unconstitutional and then trying to operate
a
mental-health system without a statute.”  Id.
 Mr.
Bluhm explained that in conformance with “all the newer
constitutional
standards that have been pronounced by courts all across the
country . . . S. 103 allows
commitment only if the person is
considered dangerous to himself or to others.”  Id. 
Mr. Bluhm noted that
S. 103 “is narrowing the class of people”
subject to court-ordered
treatment, so that only persons who are dangerous to themselves or
others—not
the “harmlessly irrational”—are subject
to compulsory treatment.  Mar. 30
Hr’g Tr. at 56-57.[5]

¶
22.        
Mr.
Bluhm testified on the meaning of the “key terms in this
bill”—the definitions
of “patient in need of further treatment” in
§ 7101(16) and “person in
need of treatment” in § 7101(17). 
Mar. 8
Hr’g Tr. at 26, 49, 134.  He explained:

Paragraph
16 defines a patient in need of treatment
. . . .  You can
see that the bill includes specific comments as to what amounts to a
risk of
injury to self or risk of injury to others.  It does not
include any
property offenses.  It does not include any nuisance-type
activities.

 

Id.
at 28.

¶
23.        
A
committee member later had the following colloquy with the other
witness,
William Dalton, who represented Vermont Legal Aid:

Sen.
Niquette:  The reason for that definition [in
§ 7101(16) and
§ 7101(17)] is to show that he is going to be a
danger
. . . .

 

Mr.
Dalton: Ultimately, yes, a few weeks down the road.
. . . [Y]ou can
get them before it gets to be that kind of condition.

 

Sen.
Niquette: If he’s going to starve, in other words.

 

Mr. Dalton: Because
the mental health field is
tremendously concerned that they can see someone who is really starting
to go
downhill rapidly, and if they can do something now, they think they can
help.  Two or three weeks from now, they represent they
can’t.  I
have some serious reservations about that, but this, like all pieces of
legislation, is a compromise and that is as stringent and concise a
definition
as we could come up with, that would satisfy most of the
situations.  It
is clear that some people are going to slip through the cracks.

 

Id.
at
60-61.  This legislative history suggests that the Legislature
likely
understood “near future” to apply to both
deterioration and
dangerousness.  For the reasons noted above, we do not assume
that this
one witness’s assessment of how imminent the danger must be
before a person
qualifies as “in need of treatment” reflects the
Legislature’s intended
understanding of the meaning of “the near
future.”  Nor do we rest our
decision in this case solely or even primarily on this legislative
history.  But we do conclude that the overall legislative
history provides
further support for our view that the Legislature did not intend to
authorize
continued involuntary treatment based on potential dangerousness at
some
undefined time in the future.

¶ 24.        
Fourth, we have previously emphasized the
imminence of
deterioration, and the resultant danger to self or others, as
significant.  In In re E.T., we approved
of the issuance of an ONH
to a person suffering from paranoid schizophrenia where experts for
both
parties agreed that there was a “present likelihood that
[respondent] will rapidly
deteriorate and become violent if he stops taking his
medication” and that “if
E.T. were to discontinue treatment, as he has on several occasions, the
likelihood of rapid decompensation and resultant public danger is
high.” 
2004 VT 111, ¶¶ 14-15, 177 Vt. 405, 865 A.2d
416 (emphasis added). 
Similarly, in In re M.C., we affirmed an ONH
because the respondent had
attempted to kill his brother in the past, the expert testimony was
that the
respondent was “just as dangerous as he ever was,”
and the court made a
specific finding that “the ONH was the least restrictive
means of providing
. . . treatment and protecting the
public.”  2005 VT 60,
¶¶ 1-2, 5, 7, 178 Vt. 585, 878 A.2d 284
(mem.) (quotation marks
omitted).  See also Conservatorship
of Murphy,
184 Cal. Rptr. 363, 365 (Cal. Ct. App. 1982) (finding expert
testimony
that ward, an alcoholic, “was gravely disabled
. . . based upon a
‘likelihood’ that if he were released he would at
some future time return to
the use of alcohol” to be insufficient to show that he
“was ‘presently’ gravely
disabled”); State v. J.G., 180
P.3d 63, 65 (Or. Ct. App. 2008) (finding
“conclusion that appellant is a danger to herself
because . . . at some unknown point
in the future” she might be
harmed to be “unduly
speculative” and
insufficient to “establish, by clear and convincing evidence,
that appellant is
a danger to herself”).

¶
25.        
Finally,
we construe statutes so as to avoid constitutional difficulties, if
possible.  State v. Cantrell, 151 Vt. 130,
134, 558 A.2d 639, 642
(1989).  As we have recognized, “orders
of
nonhospitalization implicate important liberty interests requiring due
process
protections.”  In re G.K., 147
Vt. 174, 176, 514 A.2d 1031, 1032
(1986).  The ONH here requires respondent to “keep
all appointments as set
with, or by” RMHS; “take all medications in form
and dosage . . . as
prescribed . . . and take medications in front of
RMHS, if
requested”; and “follow the treatment
plan” as set by RMHS.  It is “beyond
dispute” that such restrictions clearly impinge upon an
individual’s “right to
unrestricted travel, and . . . right to be free from
unwarranted
intrusions of one’s bodily integrity.”  Id.
at 176-78, 514 A.2d at
1032-33 (noting that Vermont Constitution mandates presumption that
“people are born free
and enjoy freedom from restraint as a
natural, inherent and unalienable right” (quoting Vt. Const.
ch. I, art.
1)).  “[P]ersons
subject to
nonhospitalization orders are entitled to the same due process
protections as
persons subject to commitment orders insofar as the right
to periodic
review of their mental health status is concerned.” 
Id. at 176,
514 A.2d at 1032.

¶
26.        
If we
were to adopt the construction of § 7101(16) that the
State urges,
allowing a finding that the person is likely to become a person in need
of
treatment at some point in the future (however distant) to support a
continued
ONH, it would present serious constitutional concerns.  As we
have held, “[i]n
decisions based on a person’s mental status, few
things are static.”  In re T.C.,
2007 VT 115, ¶ 19, 182 Vt. 467, 477, 940 A.2d 706.
 That a person
could or will “eventually” become a person in need
of treatment is, standing
alone, a thin reed upon which to predicate a continued intrusion upon
fundamental liberty.  See also In re
Mental Health of A.S.B.,
2008 MT 82, ¶¶ 38-46, 180 P.3d 625 (Gray,
C.J., dissenting) (dissenting
from court’s failure to consider constitutionality of
“deterioration standard”
purporting to allow involuntary commitment based on mere possibility
that
individual’s condition may worsen to point where individual
would pose threat
of harm to self or others, and expressing view that “it is
unconstitutional to
involuntarily commit a mentally ill person on the basis of a mental
disorder
which will, ‘if untreated, predictably result in
deterioration’ . . .
to the point that the person becomes a danger to self or others or
unable to
provide for basic needs,” because
“[p]eople—mentally ill or
otherwise—generally
have a right to be left alone unless they are an imminent danger to
those
around them or are committing a criminal offense”).

¶
27.        
We
recognize the difficult and sensitive nature of cases such as this
one. 
Mental health professionals, family members, and judges are all
rightfully
concerned with the welfare of individuals suffering from serious
psychiatric
disorders.  It is undisputed that T.S.S.’s
care-providers sought a
continued ONH because they are concerned for his well-being and want to
protect
him from making a choice that would lead him, eventually, to become a
danger to
himself.  We also recognize that the State does not have
“to wait until [a
person] actually becomes dangerous to intervene,” and remain
on guard against
“a  ‘revolving door’ syndrome
characterized by recurring commitments,
medication, rejection of medication, and crisis
intervention,” which we have
warned against.  In re P.S., 167 Vt. 63,
74, 702 A.2d 98, 105
(1997).  But the fact is, people who do not pose an imminent
danger to
themselves or others have a right to autonomy that includes the right
to make
decisions about the most personal of matters, even if those decisions
are
deemed by others to be profoundly ill-advised.  Our
interpretation of
§ 7101(16) is most consonant with the
statute’s text and purposes and best
balances the constitutional rights of individuals with the
State’s valid
interest in protecting individuals and the public.  See In
re Torski C.,
918 N.E.2d 1218, 1232 (Ill. App. Ct. 2009) (“The threshold
must be narrowly
tailored to ensure the commitment of only those individuals who are
considered
dangerous, yet broad enough to ensure that [a person] who desperately
need[s]
treatment can get it before his or her condition becomes significantly
worse
and treatment may be less successful.”).

II.  Findings and Evidence

 

¶
28.        
We
next turn to whether the evidence was sufficient to support the
superior
court’s findings, and whether the findings were sufficient to
support the
court’s legal conclusion.  We accept the superior
court’s factual findings
unless they are clearly erroneous; that is, unless there is no
“reasonable and
credible evidence to support them.”  M.B.,
2004 VT 58, ¶ 6.

¶
29.        
The
court found that if T.S.S. terminated his treatment, his condition
would
deteriorate in six months to one year.  The court also found
that T.S.S.
would “eventually” become a person in need of
treatment, noting that “[t]his
has been his pattern over the last ~15 years.” 
However, the court
explained that “[i]t is unknown when [T.S.S.’s
condition] will deteriorate to
the point wherein he will be ‘a person in need of
treatment.’ ”

¶
30.        
This
finding, which is the most that the superior court could make based on
the
evidence presented, is insufficient to meet the statutory requirement
that the
court find that T.S.S. is likely to become a person in need of
treatment “in
the near future.”  An individual’s pattern
of rapid deterioration and
return to the status of person in need of services following the
termination of
an ONH may provide evidence that there is a substantial probability
that the
person will become a person in need of services in the near future if
an ONH is
discontinued.  In determining the weight to assign such a
pattern, a court
should consider, among other factors, the frequency of the pattern; the
recency
of the pattern; the speed at which the person’s condition has
deteriorated to
the point that he or she becomes a person in need of supervision; and
expert
testimony concerning the likelihood that the pattern will repeat.

¶
31.        
In this
case, the superior court’s references to T.S.S.’s
pattern over the last fifteen
years cannot support a continued ONH, given the record evidence of that
pattern.  The question in this case is whether T.S.S. is
likely to pose a
danger to himself in the near future.  The last specific
evidence of
T.S.S. actually posing a danger to himself dates back to 2003, when he
looked
emaciated and was experiencing delusions that his food was being
poisoned.  The record reflects that RMHS discontinued his
treatment in 2008,
and that he was not under any compulsory treatment until
2012.  Even then,
we know only that T.S.S. was charged with unlawful mischief, that he
was found
incompetent to stand trial, and that he stipulated to an ONH in
connection with
the charges stemming from that incident.  Given this record,
we cannot
conclude that T.S.S.’s historical pattern can support a
finding that he is
likely to deteriorate to the point of becoming a person in need of
treatment in
the near future.

¶
32.        
This case is quite similar to In re T.C.,
in which we affirmed
the superior court’s denial of the commissioner’s
petition for continued
treatment.  2007 VT 115, ¶ 1.  In
that case, the respondent
suffered from paranoid schizophrenia; like the respondent in this case,
he did
not acknowledge any mental illness and was opposed to taking
medication, which
caused adverse side effects.  The respondent in T.C.
was
unmedicated for an extended period of time, yet there was no evidence
that the
respondent had been violent or threatening in the recent
past.  For that
reason, despite T.C.’s history of violence in the more
distant past, we found
that the superior court’s conclusion that T.C. was no longer
a patient in need
of continued treatment was supported by the evidence.  Id.
¶¶ 24, 28.

¶
33.        
For
the above reasons, we conclude that the superior court applied the
wrong legal
standard to the evidence, and that the evidence and findings do not
support a
continued ONH in this case.

The
order of
non-hospitalization issued by the superior court on May 27, 2014 is
vacated.



 

 

 
            
 

 

 
  

 

 
 FOR
THE COURT:

 

 

 

 
  

 

 
  

 

 
  

 

 

 

 
  

 

 
  

 

 
  

 

 

 

 
  

 

 
  

 

 
  

 

 

 

 
  

 

 
  

 

 
 Associate Justice

  

 

 

 


 

¶
34.        
EATON,
J., concurring.   While I concur fully with
the outcome here, I
write separately to underscore my concern with the majority’s
reliance upon
witness testimony before a legislative committee in determining
legislative
intent.  Ante,
¶¶ 19-23.  It is, of course, our
obligation to construe statutes in a manner that is reflective of
legislative
intent, e.g., Town of Calais v. Cnty. Road
Comm’rs, 173 Vt.
620, 621, 795 A.2d 1267, 1268 (2002) (mem.); however, resort
to
legislative history to ascertain that intent becomes necessary only
when a
statute is ambiguous, Cavanaugh v. Abbott Labs.,
145 Vt. 516,
530, 496 A.2d 154, 163 (1985).  I question whether
any ambiguity
exists concerning this statute, as the constitutional concerns raised
by the
construction employed by the trial court seem apparent.  Since
it is also
our obligation to construe a statute in a constitutional manner if
possible, State v.
Colby, 2009 VT 28, ¶ 7,
185 Vt. 464, 972 A.2d 197, I do
not believe resort to legislative history is necessary here to conclude
that
the trial court misconstrued 18 V.S.A.
§ 7101(16).  We are
capable of giving this statute proper construction without determining
legislative intent and therefore without the need to delve into
legislative
history.

¶
35.        
Further,
in determining legislative intent, we have always viewed the testimony
of
witnesses before a legislative committee to be of very limited value.
 State v.
Madison, 163 Vt. 360, 373, 658 A.2d 536,
545 (1995) (explaining
that witness’s comments at committee hearing “are
accorded little weight” in
determining legislative intent).  Such skepticism even extends
to the
testimony of legislators concerning legislative intent.  Trudell v.
State, 2013 VT 18, ¶ 27, 193 Vt.
515, 71 A.3d 1235 (“Courts
generally give little weight to an individual legislator’s
interpretation of the
law once enacted because it cannot reflect the thought processes of the
entire
Legislature.”).  The testimony of non-legislator
witnesses
regarding proposed legislation seems of even less value in the
determination of
legislative intent.

¶
36.        
Those
testifying before legislative committees vary in their subject-matter
expertise
and in their particular interests concerning any piece of
legislation. 
Yet, the testimony of each of those witnesses becomes part of the
legislative
history and thus potentially available to the Court in the
consideration of
legislative intent.  We are ill-equipped to separate the wheat
from the
chaff concerning such testimony, and have no way of knowing the extent
to which
that testimony played a role, if any, in the adoption of the
legislation
ultimately enacted.

¶
37.        
Undoubtedly,
testimony before legislative committees is of great aid at times in
helping the
Legislature identify areas of concern regarding proposed
legislation. 
When the judiciary undertakes to determine legislative intent, however,
we
should consider committee witness testimony only when
required.  Even in
those rare circumstances when it is required, we should afford it only
slight
weight in ascertaining the intent of the Legislature.  In this
case, I do
not believe that consideration of the testimony, regardless of the
expertise or
experience of those offering it, is necessary.  Accordingly, I
reach my
conclusion that the order of non-hospitalization must be vacated here
without
reliance upon any legislative history concerning the enactment of the
statute.

¶
38.        
I am
authorized to state that Chief Justice Reiber joins in this concurrence.

 



 

 

 
  

 

 
  

 

 
  

 

 

 

 
  

 

 
  

 

 
 Associate
Justice

 

 

 


 










[1]
 Dr.
Gerretson testified that she believed the charge related to T.S.S.
breaking a
window or windows, but acknowledged that she did not observe T.S.S.
breaking
any windows, that her information about the allegedly broken windows
was
limited, and that T.S.S. denied breaking any windows.  The
most we can
infer from this record is that T.S.S. was accused of breaking one or
more
windows; we have no evidence that he actually did so.

 




[2] 
Dr. Gerretson testified that T.S.S.’s
behavior as far back as 2006 was still relevant “because off
medications he
appears to have a repetitive pattern of presentation.”




[3] 
The act was approved on April 19, 1978.  The current 18 V.S.A.
§ 7101(16) and (17) differ from the original 1978 act
only in the
following minor respects: the language has been made gender-neutral,
the
original phrasing of “person who is suffering from mental
illness” has been
changed to “person who has a mental illness,” and a
comma has been added. 
2013, No. 96 (Adj. Sess.), § 100.

 




[4]
 S. 103 Mental Health; Commitment and Care:
Hearing on S. 103
Before the S. Comm. on Health & Welfare, 1977
(Adj. Sess.) (Mar. 8, 1977) [hereinafter Mar. 8 Hr’g]; S. 45,
S. 103, and S. 144: Hearing on
S. 103 Before the S. Comm.
on Health & Welfare, 1977
(Adj. Sess.) (Mar. 30,
1977) [hereinafter Mar. 30 Hr’g].




[5]
 This
idea—that dangerousness, not merely lack of insight, is
required—was emphasized
throughout hearings on the subject.  Mar. 8 Hr’g
Tr. at 10 (statement of Mr. Bluhm that S. 103
“permits commitment
only if the person is demonstrated to be dangerous and contains
. . .
examples of what kinds of things would be considered
dangerous”); id. at
58-49 (colloquy between Mr. Bluhm and Sen. Niquette emphasizing that
S. 109 “ends lack-of-insight commitments unless the
person is dangerous”);
id. at 61-62 (statement of Mr. Bluhm that under
S. 103, “the
paranoid schizophrenic” who has delusions that people are
plotting against him
but who is “not dangerous to [himself or herself],
. . . not
dangerous to others, and . . . not about to become
dangerous” cannot
be compelled to undergo treatment).